**UNITED STATES DISTRICT COURT**
**SOUTHERN DISTRICT OF NEW YORK**

| | |
|---|---|
| ELAINE WANG, | : |
| | : |
| Plaintiff, | : Civil Action No. 1:21-cv-10632 |
| | : |
| v. | : **COMPLAINT FOR VIOLATIONS OF** |
| | : **SECTIONS 14(a) AND 20(a) OF THE** |
| MONMOUTH REAL ESTATE | : **SECURITIES EXCHANGE ACT OF** |
| INVESTMENT CORPORATION, KIERAN | : **1934** |
| "KC" CONWAY, DANIEL D. CRONHEIM, | : |
| CATHERINE B. ELFLEIN, BRIAN H. | : **JURY TRIAL DEMANDED** |
| HAIMM, NEAL HERSTIK, MATTHEW I. | : |
| HIRSCH, EUGENE W. LANDY, MICHAEL | : |
| P. LANDY, SAMUEL A. LANDY, KEVIN S. | : |
| MILLER, GREGORY T. OTTO, SONAL | : |
| PANDE, and SCOTT L. ROBINSON, | : |
| | : |
| Defendants. | : |

Elaine Wang ("Plaintiff"), by and through her attorneys, alleges the following upon information and belief, including investigation of counsel and review of publicly-available information, except as to those allegations pertaining to Plaintiff, which are alleged upon personal knowledge:

1. This is an action brought by Plaintiff against Monmouth Real Estate Investment Corporation ("Monmouth or the "Company") and the members Monmouth's board of directors (the "Board" or the "Individual Defendants" and collectively with the Company, the "Defendants") for their violations of Sections 14(a) and 20(a) of the Securities Exchange Act of 1934 (the "Exchange Act"), 15 U.S.C. §§ 78n(a), 78t(a), and SEC Rule 14a-9, 17 C.F.R. 240.14a-9 and 17 C.F.R. § 244.100, in connection with the proposed merger between Monmouth and Industrial Logistics Properties Trust, a Maryland real estate investment trust, and its affiliates ("ILPT").

2.      Defendants have violated the above-referenced sections of the Exchange Act by causing a materially incomplete and misleading Preliminary Proxy Statement on Schedule 14A (the "Proxy Statement") to be filed on December 9, 2021 with the United States Securities and Exchange Commission ("SEC") and disseminated to Company stockholders.  The Proxy Statement recommends that Company stockholders vote in favor of a proposed transaction whereby Monmouth will merge with and into Maple Delaware Merger Sub LLC, a Delaware limited liability company and a wholly owned subsidiary of ILPT ("Merger Sub") with Merger Sub being the surviving entity (the "Proposed Transaction").  Pursuant to the terms of the definitive agreement and plan of merger the companies entered into on November 5, 2021 (the "Merger Agreement"), each Monmouth stockholder will receive $21.00 in cash for each share of Monmouth common stock owned (the "Merger Consideration").

3.      As discussed below, Defendants have asked Monmouth's stockholders to support the Proposed Transaction based upon the materially incomplete and misleading representations and information contained in the Proxy Statement, in violation of Sections 14(a) and 20(a) of the Exchange Act.  Specifically, the Proxy Statement contains materially incomplete and misleading information concerning the analyses performed by the Company's financial advisors, J.P. Morgan Securities LLC ("J.P. Morgan") and CSCA Capital Advisors, LLC ("CSCA") in support of their fairness opinions.

4.      It is imperative that the material information that has been omitted from the Proxy Statement is disclosed to the Company's stockholders prior to the forthcoming stockholder vote so that they can properly exercise their corporate suffrage rights.

5.      For these reasons and as set forth in detail herein, Plaintiff seeks to enjoin Defendants from taking any steps to consummate the Proposed Transaction unless and until the

material information discussed below is disclosed to Monmouth's stockholders or, in the event the Proposed Transaction is consummated, to recover damages resulting from the Defendants' violations of the Exchange Act.

## JURISDICTION AND VENUE

6. This Court has subject matter jurisdiction pursuant to Section 27 of the Exchange Act (15 U.S.C. § 78aa) and 28 U.S.C. § 1331 (federal question jurisdiction) as Plaintiff alleges violations of Sections 14(a) and 20(a) of the Exchange Act and SEC Rule 14a-9.

7. Personal jurisdiction exists over each Defendant because the Defendant conducts business in or maintains operations in this District, or is an individual who is either present in this District for jurisdictional purposes or has sufficient minimum contacts with this District as to render the exercise of jurisdiction over Defendant by this Court permissible under traditional notions of fair play and substantial justice.

8. Venue is proper in this District under Section 27 of the Exchange Act, 15 U.S.C. § 78aa, as well as under 28 U.S.C. § 1391, because the proxy solicitor for Monmouth, MacKenzie Partners, is headquartered in this District.

## PARTIES

9. Plaintiff is, and has been at all relevant times, the owner of Monmouth stocks and has held such stocks since prior to the wrongs complained of herein.

10. Individual Defendant Kieran "KC" Conway has served as a member of the Board since 2018.

11. Individual Defendant Daniel D. Cronheim has served as a member of the Board since 1989.

12. Individual Defendant Catherine B. Elflein has served as a member of the Board since 2007.

13. Individual Defendant Brian H. Haimm has served as a member of the Board since 2013 and is the Lead Independent Director.

14. Individual Defendant Neal Herstik has served as a member of the Board since 2004.

15. Individual Defendant Matthew I. Hirsch has served as a member of the Board since 2000.

16. Individual Defendant Eugene W. Landy has served as a member of the Board since 1968 and is the Founder of the Company and Chairman of the Board.

17. Individual Defendant Michael P. Landy has served as a member of the Board since 2007 and is the Company's President and Chief Executive Officer.

18. Individual Defendant Samuel A. Landy has served as a member of the Board since 1989.

19. Individual Defendant Kevin S. Miller has served as a member of the Board since 2017.

20. Individual Defendant Gregory T. Otto has served as a member of the Board since 2017.

21. Individual Defendant Sonal Pande has served as a member of the Board since 2020.

22. Individual Defendant Scott L. Robinson has served as a member of the Board since 2015.

23. Defendant Monmouth a Maryland corporation and maintains its principal offices at 101 Crawfords Corner Road, Suite 1404, Holmdel, New Jersey 07733. The Company's stock trades on the New York Stock Exchange under the symbol "MNR."

24. The defendants identified in paragraphs 10-22 are collectively referred to as the "Individual Defendants" or the "Board."

25. The defendants identified in paragraphs 10-23 are collectively referred to as the "Defendants."

## SUBSTANTIVE ALLEGATIONS

**A.** **The Proposed Transaction**

26. Monmouth, founded in 1968, is one of the oldest public equity REITs in the world. We specialize in single tenant, net-leased industrial properties, subject to long-term leases, primarily to investment-grade tenants. Monmouth is a fully integrated and self-managed real estate company, whose property portfolio consists of 121 properties, containing a total of approximately 24.5 million rentable square feet, geographically diversified across 31 states. The Company's occupancy rate is 99.7%.

27. On November 5, 2021, ILPT announced the Proposed Transaction:

> NEWTON, Mass.--(BUSINESS WIRE)--Industrial Logistics Properties Trust (Nasdaq: ILPT) today announced that it has entered into a definitive agreement to acquire all of the outstanding shares of Monmouth Real Estate Investment Corporation (NYSE: MNR) for $21.00 per share in an all-cash transaction, valued at approximately $4.0 billion, including committed MNR acquisitions, transaction costs and the assumption of $409 million of debt. The transaction adds 126 new, Class A, single tenant, net leased, e-commerce focused industrial properties to ILPT's existing high-quality portfolio and improves geographic and tenant diversity. The portfolio contains over 26 million square feet of space, has a weighted average remaining lease term of approximately 8 years, is over 80% leased to investment grade rated tenants and generates annualized rental revenue of $169.4 million. ILPT expects this transaction to be immediately accretive to Normalized Funds from Operations, or FFO, per share.
>
> John Murray, Chief Executive Officer of ILPT, made the following statement:
>
> "This transaction adds 126 high-quality industrial assets to ILPT's portfolio and expands ILPT's ability to benefit from ongoing strong fundamental tailwinds in the industrial sector. This accretive transaction more than doubles the properties in ILPT's mainland

portfolio and this scale is expected to expand ILPT's growth opportunities and access to capital which we expect will drive cash flow growth and long-term value for our shareholders."

Certain highlights of the acquired portfolio include:

- 126 industrial and logistics properties with approximately 26.3 million rentable square feet.
- Geographically diverse portfolio across 32 states with an average age of approximately 9 years.
- 99.7% occupied with a weighted average lease term of approximately 8 years.
- Over 80% of annual rents come from investment grade tenants.
- Annualized rental revenue of $169.4 million as of September 30, 2021.
- Manageable near-term lease expirations average 6.4% of contractual rents per year over the next three years.

Certain expected benefits of the transaction include:

- **Accretive Acquisition** – This acquisition is expected to be immediately accretive to Normalized FFO per share. The ultimate amount of accretion will primarily depend on the size and structure of the joint venture used by ILPT to finance this acquisition. The year one cash cap rate on this acquisition is 4.0% and the GAAP cap rate is approximately 4.3%, both of which ILPT believes are higher than could be achieved if the properties were acquired one off in marketed transactions.
- **Complements ILPT's Existing Portfolio** – The acquisition improves ILPT's mainland portfolio by adding Class A, e-commerce-focused assets, more than 80% of which are leased to investment grade tenants, with a weighted average lease term of approximately 8 years.
- **Increases Scale** – ILPT gains significant scale with high quality assets. Larger REITs with high quality portfolios historically gain greater exposure to potential property investment opportunities
- **Adds Geographic Diversity** – The acquisition adds geographic diversity for ILPT, particularly in Georgia and Texas where ILPT does not currently own industrial buildings.
- **Enhances Tenant Diversity** – The acquisition enhances tenant diversity of ILPT's existing tenant base, adding new tenant relationships with household names such as Home Depot, International Paper, Mercedes Benz, Toyota and Ulta.

- **Provides Platform for Additional Growth** – The acquisition includes an active pipeline both through acquisitions and property expansions which provides ILPT with attractive future growth potential and enhanced tenant retention. It also allows ILPT to continue to nurture MNR's existing strong relationships with merchant builders, providing a platform for growth in addition to ILPT's traditional external growth through acquisition and organic growth through its leasing activities.

**Deal Structure, Approvals and Timing**

To finance this acquisition, ILPT expects to enter into a joint venture with one or more institutional investors for equity investments of between approximately $430 million and $1.3 billion. Accordingly, ILPT does not currently plan to issue common shares in connection with this transaction. ILPT plans to finance the balance of the $4.0 billion purchase with proceeds from new mortgage debt and the assumption of approximately $409 million of existing MNR mortgage debt. Depending on the ultimate size of the joint venture equity investments, ILPT may also use proceeds from the sale of up to approximately $1.6 billion of MNR properties to finance this transaction. Following the closing of the acquisition and execution of the financing plan described above, consolidated net debt to Adjusted EBITDA is expected to be between 6 and 8 times at year end 2022. To ensure ILPT can finance the closing of this transaction, ILPT has secured commitments from lenders for a $4.0 billion bridge loan facility.

The transaction is subject to customary closing conditions, including MNR shareholder approval, and is expected to close in the first half of 2022.

**Non-GAAP Financial Measures**

ILPT refers to Normalized FFO and Adjusted EBITDA in this press release. Normalized FFO and Adjusted EBITDA are "non-GAAP financial measures" within the meaning of the applicable rules of the SEC. For a calculation and definition of these measures, and a reconciliation to net income, please see ILPT's Third Quarter 2021 Supplemental Operating and Financial Data, or the Supplemental. The Supplement was attached as Exhibit 99.2 to ILPT's Current Report on Form 8-K furnished with the SEC on October 27, 2021. In addition, please see the Supplemental for statements as to why ILPT's management believes that these measures provide useful information to investors and additional purposes for which ILPT management uses this measure.

**Advisors**

Citigroup is acting as exclusive financial advisor, Hunton Andrews Kurth LLP is serving as legal advisor on the transaction and Skadden, Arps, Slate, Meagher & Flom LLP is serving as legal advisor on the bridge financing to ILPT. Joint lead arrangers and bookrunners for the bridge loan are Citigroup Global Markets Inc. and UBS Securities LLC.

\* \* \*

28.     The Board has unanimously agreed to the Proposed Transaction. It is therefore imperative that Monmouth's stockholders are provided with the material information that has been omitted from the Proxy Statement, so that they can meaningfully assess whether or not the Proposed Transaction is in their best interests prior to the forthcoming stockholder vote.

**B.     The Materially Incomplete and Misleading Proxy Statement**

29.     On December 9, 2021, Monmouth filed the Proxy Statement with the SEC in connection with the Proposed Transaction. The Proxy Statement was furnished to the Company's stockholders and solicits the stockholders to vote in favor of the Proposed Transaction. The Individual Defendants were obligated to carefully review the Proxy Statement before it was filed with the SEC and disseminated to the Company's stockholders to ensure that it did not contain any material misrepresentations or omissions. However, the Proxy Statement misrepresents and/or omits material information that is necessary for the Company's stockholders to make an informed decision concerning whether to vote in favor of the Proposed Transaction, in violation of Sections 14(a) and 20(a) of the Exchange Act.

*Omissions and/or Material Misrepresentations Concerning Financial Projections*

30.     The Proxy Statement fails to provide material information concerning financial projections by management and relied upon by the Financial Advisors in their analyses. The Proxy Statement discloses management-prepared financial projections for the Company which are

8

materially misleading. The Proxy Statement indicates that in connection with the rendering of its fairness opinion, that the management prepared certain non-public financial forecasts (the "Company Projections") and provided them to the Board and the Financial Advisors by management of both Monmouth with forming a view about the stand-alone and pro forma valuations. Accordingly, the Proxy Statement should have, but fails to provide, certain information in the projections that managements provided to the Board and their financial advisors. Courts have uniformly stated that "projections … are probably among the most highly-prized disclosures by investors. Investors can come up with their own estimates of discount rates or [] market multiples. What they cannot hope to do is replicate management's inside view of the company's prospects." *In re Netsmart Techs., Inc. S'holders Litig.*, 924 A.2d 171, 201-203 (Del. Ch. 2007).

31. For the Company Projections, the Proxy Statement provides values for non-GAAP (Generally Accepted Accounting Principles) financial metrics for fiscal years 2022 through 2026: Cash Net Operating Income; Adjusted EBITDA; Funds from Operations per Share; Adjusted Funds from Operations per Share; and Unlevered Free Cash Flows as calculated by each of the Company's financial advisors, but fails to provide line items used to calculate these metrics or a reconciliation of these non-GAAP metrics to their most comparable GAAP measures, in direct violation of Regulation G and consequently Section 14(a).

32. When a company discloses non-GAAP financial measures in a Proxy Statement that were relied on by a board of directors to recommend that stockholders exercise their corporate suffrage rights in a particular manner, the company must, pursuant to SEC regulatory mandates, also disclose all projections and information necessary to make the non-GAAP measures not misleading, and must provide a reconciliation (by schedule or other clearly understandable method) of the differences between the non-GAAP financial measure disclosed or released with

the most comparable financial measure or measures calculated and presented in accordance with GAAP. 17 C.F.R. § 244.100.

33. The SEC has noted that:

> companies should be aware that this measure does not have a uniform definition and its title does not describe how it is calculated. Accordingly, a clear description of how this measure is calculated, as well as the necessary reconciliation, should accompany the measure where it is used. Companies should also avoid inappropriate or potentially misleading inferences about its usefulness. For example, "free cash flow" should not be used in a manner that inappropriately implies that the measure represents the residual cash flow available for discretionary expenditures, since many companies have mandatory debt service requirements or other non-discretionary expenditures that are not deducted from the measure.

34. Thus, to cure the Proxy Statement and the materially misleading nature of the forecasts under SEC Rule 14a-9 as a result of the omitted information in the Proxy Statement, Defendants must provide a reconciliation table of the non-GAAP measure to the most comparable GAAP measure to make the non-GAAP metrics included in the Proxy Statement not misleading.

*Omissions and/or Material Misrepresentations Concerning Financial Analyses*

35. With respect to J.P. Morgan's *Public Trading Multiples* analysis for Monmouth, the Proxy Statement fails to disclose the individual multiples and financial metrics for the companies observed by J.P. Morgan in the analysis.

36. With respect to J.P. Morgan's *Transaction Multiples Analysis*, the Proxy Statement fails to disclose the individual multiples and financial metrics for the Gramercy Acquisition and the reason only one transaction was observed by J.P. Morgan.

37. With respect to J.P. Morgan's *Discounted Cash Flow Analysis*, the Proxy Statement fails to disclose: (i) the range of terminal values for Monmouth; (ii) the inputs and assumptions underlying the use of the range of perpetual growth rates of 1.75% to 2.25%; (iii) the inputs and

assumptions underlying the use of the discount rates ranging from 6.50% to 7.00%; (iv) the weighted average cost of capital of Monmouth; and (v) the net debt and other adjustments for Monmouth as of September 30, 2021.

38. With respect to CSCA's *Capitalization Rate Valuation Analysis*, the Proxy Statement fails to disclose the inputs and assumptions underlying the use of cash capitalization rates from 4.50% to 5.25% for Monmouth.

39. With respect to CSCA's *Premiums Paid Analysis*, the Proxy Statement fails to disclose: (i) the premiums observed for each of the transactions reviewed; and (ii) the closing date of each transaction.

40. With respect to CSCA's *Discounted Cash Flow Analysis*, the Proxy Statement fails to disclose: (i) the range of terminal values for Monmouth; (ii) the inputs and assumptions underlying the use of the range of EBITDA multiples ranging from 20.0x to 23.0x; (iii) the inputs and assumptions underlying the use of the discount rates ranging from 6.00% to 6.50%; and (iv) the weighted average cost of capital of Monmouth.

41. In sum, the omission of the above-referenced information renders statements in the Proxy Statement materially incomplete and misleading in contravention of the Exchange Act. Absent disclosure of the foregoing material information prior to the special stockholder meeting to vote on the Proposed Transaction, Plaintiff will be unable to make a fully-informed decision regarding whether to vote in favor of the Proposed Transaction, and she is thus threatened with irreparable harm, warranting the injunctive relief sought herein.

## CLAIMS FOR RELIEF

### COUNT I

**On Behalf of Plaintiff Against All Defendants for Violations of Section 14(a) of the Exchange Act and Rule 14a-9 and 17 C.F.R. § 244.100**

42.     Plaintiff incorporates each and every allegation set forth above as if fully set forth herein.

43.     Rule 14a-9, promulgated by the SEC pursuant to Section 14(a) of the Exchange Act, provides that proxy communications with stockholders shall not contain "any statement which, at the time and in the light of the circumstances under which it is made, is false or misleading with respect to any material fact, or which omits to state any material fact necessary in order to make the statements therein not false or misleading." 17 C.F.R. § 240.14a-9.

44.     Defendants have issued the Proxy Statement with the intention of soliciting stockholder support for the Proposed Transaction.  Each of the Defendants reviewed and authorized the dissemination of the Proxy Statement and the use of their name in the Proxy Statement, which fails to provide critical information regarding, among other things, the financial projections that were prepared by the Company and relied upon by the Board in recommending the Company's stockholders vote in favor of the Proposed Transaction.

45.     In so doing, Defendants made untrue statements of fact and/or omitted material facts necessary to make the statements made not misleading.  Each of the Individual Defendants, by virtue of their roles as officers and/or directors, were aware of the omitted information but failed to disclose such information, in violation of Section 14(a).  The Individual Defendants were therefore negligent, as they had reasonable grounds to believe material facts existed that were misstated or omitted from the Proxy Statement, but nonetheless failed to obtain and disclose such information to stockholders although they could have done so without extraordinary effort.

46.     Defendants were, at the very least, negligent in preparing and reviewing the Proxy Statement.  The preparation of a Proxy Statement by corporate insiders containing materially false or misleading statements or omitting a material fact constitutes negligence.  Defendants were

negligent in choosing to omit material information from the Proxy Statement or failing to notice the material omissions in the Proxy Statement upon reviewing it, which they were required to do carefully.  Indeed, Defendants were intricately involved in the process leading up to the signing of the Merger Agreement and the preparation and review of strategic alternatives.

47. The misrepresentations and omissions in the Proxy Statement are material to Plaintiff, who will be deprived of her right to cast an informed vote if such misrepresentations and omissions are not corrected prior to the vote on the Proposed Transaction.  Plaintiff has no adequate remedy at law.  Only through the exercise of this Court's equitable powers can Plaintiff be fully protected from the immediate and irreparable injury that Defendants' actions threaten to inflict.

## COUNT II

**On Behalf of Plaintiff Against the Individual Defendants for Violations of Section 20(a) of the Exchange Act**

48. Plaintiff incorporates each and every allegation set forth above as if fully set forth herein.

49. The Individual Defendants acted as controlling persons of Monmouth within the meaning of Section 20(a) of the Exchange Act as alleged herein.  By virtue of their positions as directors of Monmouth, and participation in and/or awareness of the Company's operations and/or intimate knowledge of the incomplete and misleading statements contained in the Proxy Statement filed with the SEC, they had the power to influence and control and did influence and control, directly or indirectly, the decision making of Monmouth, including the content and dissemination of the various statements that Plaintiff contends are materially incomplete and misleading.

50. Each of the Individual Defendants was provided with or had unlimited access to copies of the Proxy Statement and other statements alleged by Plaintiff to be misleading prior to

and/or shortly after these statements were issued and had the ability to prevent the issuance of the statements or cause the statements to be corrected.

51. In particular, each of the Individual Defendants had direct and supervisory involvement in the day-to-day operations of Monmouth, and, therefore, is presumed to have had the power to control or influence the particular transactions giving rise to the Exchange Act violations alleged herein, and exercised the same. The omitted information identified above was reviewed by the Board prior to voting on the Proposed Transaction. The Proxy Statement at issue contains the unanimous recommendation of the Board to approve the Proposed Transaction. The Individual Defendants were thus directly involved in the making of the Proxy Statement.

52. In addition, as the Proxy Statement sets forth at length, and as described herein, the Individual Defendants were involved in negotiating, reviewing, and approving the Merger Agreement. The Proxy Statement purports to describe the various issues and information that the Individual Defendants reviewed and considered. The Individual Defendants participated in drafting and/or gave their input on the content of those descriptions.

53. By virtue of the foregoing, the Individual Defendants have violated Section 20(a) of the Exchange Act.

54. As set forth above, the Individual Defendants had the ability to exercise control over and did control a person or persons who have each violated Section 14(a) and Rule 14a-9, by their acts and omissions as alleged herein. By virtue of their positions as controlling persons, these defendants are liable pursuant to Section 20(a) of the Exchange Act. As a direct and proximate result of Individual Defendants' conduct, Plaintiff will be irreparably harmed.

55. Plaintiff has no adequate remedy at law. Only through the exercise of this Court's equitable powers can Plaintiff be fully protected from the immediate and irreparable injury that Defendants' actions threaten to inflict.

## RELIEF REQUESTED

WHEREFORE, Plaintiff demands injunctive relief in her favor and against the Defendants jointly and severally, as follows:

A. Preliminarily and permanently enjoining Defendants and their counsel, agents, employees and all persons acting under, in concert with, or for them, from proceeding with, consummating, or closing the Proposed Transaction, unless and until Defendants disclose the material information identified above which has been omitted from the Proxy Statement;

B. Rescinding, to the extent already implemented, the Merger Agreement or any of the terms thereof, or granting Plaintiff rescissory damages;

C. Directing the Defendants to account to Plaintiff for all damages suffered as a result of their wrongdoing;

D. Awarding Plaintiff the costs and disbursements of this action, including reasonable attorneys' and expert fees and expenses; and

E. Granting such other and further equitable relief as this Court may deem just and proper.

## JURY DEMAND

Plaintiff demands a trial by jury.

Dated: December 13, 2021               **MELWANI & CHAN LLP**

                                       By: */s/ Gloria Kui Melwani*
                                       Gloria Kui Melwani
                                       1180 Avenue of the Americas, 8th Fl.
                                       New York, NY 10036
                                       Telephone: (212) 382-4620

15

        Email: gloria@melwanichan.com

*Attorneys for Plaintiff*